IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF IOWA
                       DAVENPORT DIVISION

CLINTON SUBCLIFF,              )
                               )      NO. 3:05-cv-00001-RAW
        Plaintiff,             )
                               )
     vs.                       )
                               )
BRANDT ENGINEERED PRODUCTS,    )
LTD. and WALSH AUTOMATION,     )
INC.,                          )
                               )
        Defendants.            )
                               )      RULING ON MOTION FOR
-----------------------------)        SUMMARY JUDGMENT OF
BRANDT ENGINEERED PRODUCTS,    )      THIRD-PARTY DEFENDANT
LTD.,                          )      IPSCO TUBULARS INC.
                               )
        Third-Party Plaintiff, )
                               )
     vs.                       )
                               )
IPSCO TUBULARS, INC.,          )
                               )
        Third-Party Defendant. )

     This matter is before the Court following hearing on
third-party defendant IPSCO Tubulars Inc.'s (IPSCO) motion for
summary judgment [51]. The underlying action was filed by Clinton
Subcliff on January 4, 2005. In it he makes product liability
claims alleging design defect, manufacturing defect and failure to
warn, as well as negligence claims, against Brandt Engineered
Products, Ltd. (Brandt) and Walsh Automation, Inc. (Walsh),[1] based
on the design and installation of mechanical (Brandt) and
electrical (Walsh) equipment on a "finishing line" at IPSCO's plant

_____

        [1] The Court has recently been informed Walsh has settled the
claims brought against it.

in Camanche, Clinton County, Iowa. Mr. Subcliff was injured on April 4, 2003 when he was struck in the head by a pipe while working in the area of the finishing line. He sues for damages.

On November 4, 2005 Brandt filed a third-party complaint against IPSCO for contribution and/or common law indemnity. The contribution claim is based on IPSCO's alleged negligence in various particulars. As it has evolved, the indemnity claim is based on two grounds: (1) an alleged independent duty to monitor and notify Brandt of problems with the finishing line; and (2) the restitution principle in Restatement (First) of Restitution § 90 (1937).[2] IPSCO has denied Brandt's claims and moves for summary judgment on the basis that as Mr. Subcliff's employer, it is immune from liability for contribution by reason of Iowa's workers' compensation laws, the evidence is insufficient to establish it owed an independent duty to Brandt, and section 90 is inapplicable in the circumstances.

The Court has diversity jurisdiction, 28 U.S.C. § 1332(a)(1). It is undisputed Iowa law provides the rule of decision. The matter is before the undersigned pursuant to 28 U.S.C. § 636(c).

---

[2] An additional claim of indemnity based on a theory of active/passive negligence has been abandoned by Brandt in light of the Iowa Supreme Court's rejection of that species of indemnity as inconsistent with Iowa's statutory framework for comparative fault. American Trust & Savings Bank v. United States Fidelity & Guaranty Co., 439 N.W.2d 188, 190 (Iowa 1989).

# I.

## SUMMARY JUDGMENT

IPSCO Tubulars is entitled to summary judgment if the affidavits, pleadings, and discovery materials show "there is no genuine issue as to any material fact and [it] is entitled to judgment as a matter of law." E.E.O.C. v. Trans States Airlines, Inc., ___ F.3d ___, ___, 2006 WL 2669973, *3 (8th Cir. Sept. 19, 2006); Allsup, Inc. v. Advantage 2000 Consultants, Inc., 428 F.3d 1135, 1138 (8th Cir. 2005); Erenberg v. Methodist Hospital, 357 F.3d 787, 791 (8th Cir. 2004); Fed. R. Civ. P. 56(c); see Baucom v. Holiday Companies, 428 F.3d 764, 766 (8th Cir. 2005). The Court must view the facts in the light most favorable to the non-moving party, and give that party the benefit of all reasonable inferences which can be drawn from them, "that is, those inferences which may be drawn without resorting to speculation." Mathes v. Furniture Brands Int'l, Inc., 266 F.3d 884, 885-86 (8th Cir. 2001)(citing Sprenger v. Federal Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001)); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Howard v. Columbia Public Schl. Dist., 363 F.3d 797, 800 (8th Cir. 2004)("unreasonable inferences or sheer speculation" not accepted as fact); Erenberg, 357 F.3d at 791. An issue of material fact is genuine if it has a real basis in the record. Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992) (citing Matsushita, 475 U.S. at 586-87 (1986)). A

genuine issue of fact is material if it "might affect the outcome of the suit under governing law." Hartnagel, 953 F. 2d at 395 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)); see Littrell v. City of Kansas City, Mo., 459 F.3d 918, 921 (8th Cir. 2006)("A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party."); Baucom, 428 F.3d at 766 ("There is no genuine issue of material fact if the evidence is such that a reasonable jury could not return a verdict for [plaintiff]"); Hitt v. Harsco Corp., 356 F.3d 920, 923 (8th Cir. 2004); Rouse v. Benson, 193 F.3d 936, 939 (8th Cir. 1999); cf. Johnson v. University of Iowa, St. Bd. of Regents, 431 F.3d 325, 328 (8th Cir. 2005)("Summary judgment is still appropriate . . . when the disputed facts will not affect the outcome of the suit").

It is the non-moving party's obligation to "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." Rouse, 193 F.3d at 939; see Littrell, 459 F.3d at 921; Grabovac, 426 F.3d at 955 (non-moving party cannot "simply rest upon the pleadings," quoting Jeseritz v. Potter, 282 F.3d 3542, 545 (8th Cir. 2002)); Baucom, 428 F.3d at 766 (plaintiff may not rely on "mere allegations"); Hitt, 356 F.3d at 923. "We consider only admissible evidence and disregard portions of various affidavits and

4

depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact." <u>Howard</u>, 363 F.3d at 801. In assessing a motion for summary judgment a court must determine whether a fair-minded trier of fact could reasonably find for the non-moving party based on the evidence presented. <u>Anderson</u>, 477 U.S. at 248; <u>Herring v. Canada Life Assurance Co.</u>, 207 F.3d 1026, 1030 (8th Cir. 2000).

## II.

### FACTUAL BACKGROUND

Except in a few particulars the underlying facts are not disputed. What follows is undisputed, or for the purposes of the summary judgment motion may be taken as undisputed.

Though there is not much in the record about it, the Court understands that IPSCO's Camanche, Iowa plant manufactures steel pipe. IPSCO found it convenient to obtain new hires for the plant from local business offering temporary employment services, one of which was Sedona Staffing Services (Sedona).[3] Workers obtained from Sedona would work in the plant as temporary employees for a probationary period of typically six months or more and, if they worked out, would be offered direct, permanent employment with IPSCO. (Brandt App. at 7-8; IPSCO App. at 57-58). In fact, in its advertising Sedona promoted this kind of arrangement in its "Temp-to-Hire" and "Smart-Hire" programs. (Brandt App. at 55).

---

[3] Sedona is the d/b/a of Sunrise Enterprises, Inc.

In August 2000 Sedona entered into a Contract Service Agreement with IPSCO to provide workers, variously referred to in the document as "temporary employees" or Sedona "personnel." (IPSCO App. at 65-79). Sedona agreed to provide IPSCO with workers qualified to provide services requested by IPSCO. (Id. at 68, ¶ 1.1). With respect to the supervision of the temporary employees the contract stated:

> At all times, Temporary Employees shall be under the control and supervision of IPSCO personnel while performing work for IPSCO. SEDONA STAFFING SERVICES is not obligated to, and in fact is prohibited from, engaging in a supervisory role over Temporary Employees during the period and time where Temporary Employees are providing services for IPSCO. Temporary Employees shall report for work and maintain time records in the same manner as that prescribed for IPSCO employees. IPSCO personnel will direct both the manner in which a Temporary Employee's job is performed as well as the method by which work is performed. IPSCO shall have the sole right to assign the tasks it deems appropriate for Temporary Employees and will set the standard of quality for how those tasks are performed.

(Id. at 70). IPSCO agreed to provide all equipment used by the temporary employees, "site specific" training and safety training. (Id.) Sedona acknowledged that in the event of a work-related injury the worker's sole and exclusive remedy would be through Iowa's workers' compensation laws. (Id.) Sedona agreed to procure and maintain sufficient workers' compensation insurance as required by law as well as other stipulated forms of insurance, and to furnish certificates of insurance naming IPSCO as an additional

insured. (<u>Id.</u> at 71-71). Sedona assumed the responsibility for the payment of all federal, state and local taxes or contributions required by federal, state and local law including specifically employment, Social Security, and income tax laws. (<u>Id.</u> at 74).

The Contract Service Agreement also addressed the nature of the employment relationship between IPSCO and the temporary employees:

> THE PARTIES AGREE that IPSCO will be a joint employer of any Temporary Employee assigned to IPSCO for purposes of workers' compensation and immunity from civil liability. For all other purposes, including applicable employee benefits laws, SEDONA STAFFING SERVICES shall be an independent contractor and not an agent, joint venturer, partner or representative of IPSCO. Neither SEDONA STAFFING SERVICES nor its personnel shall be entitled to any of the benefits provided by IPSCO to its employees, including, but not limited to, workers compensation insurance, unemployment insurance, and health retirement, and welfare benefits.

(IPSCO App. at 73-74).

IPSCO paid Sedona 138 percent of the hourly wage for each temporary employee. Sedona paid the employee wages due. From the additional 38% Sedona paid payroll taxes, unemployment compensation liability and workers compensation insurance expenses, and other expenses associated with Sedona's human resource management function. The 38% figure also incorporated a profit margin for Sedona. (Brandt App. at 6-9; IPSCO App. at 60; IPSCO Supp. App. at 167, 195).

IPSCO interviewed all personnel who might be hired to work at the Camanche plant, maintained the power to reject any candidates, and retained the right to terminate the services of any worker sent by Sedona by notifying Sedona the employee's services were no longer needed at IPSCO. (IPSCO App. at 59; IPSCO Supp. App. at 196). IPSCO required all workers provided by Sedona to sign a form "Contract of Hire Acknowledgment of IPSCO as Employer and Agreement Concerning Remedies for Injuries" ("Contract of Hire") before they were sent to IPSCO, the content of which is discussed further below. (IPSCO App. at 78-79; Brandt App. at 18, 20).

Temporary employees at the IPSCO plant shared the same facilities, such as the lunchroom. (IPSCO App. at 46). As far as Mr. Subcliff could tell there was no difference between the way he and permanent IPSCO employees were treated in the workplace. (Id.) The summary judgment record contains no evidence otherwise. Though their base wages were comparable, temporary employees did not receive the same benefits as permanent IPSCO employees and were limited to those offered by Sedona. (Brandt App. at 9, 11).

Around January 2003 Mr. Subcliff contacted Sedona about a job. He completed an application and indicated the types of work he was interested in performing. (IPSCO App. at 31). In March 2003 a Sedona representative accompanied Mr. Subcliff and two other individuals to the IPSCO plant for job interviews, which were conducted by two or three IPSCO employees. (Id. at 32-33). A day or

8

two after the interview Mr. Subcliff was notified by Sedona that he was hired and was to report to the IPSCO plant for orientation. (<u>Id.</u> at 33).

Mr. Subcliff received his IPSCO "new employee indoctrination" on March 14, 2003 which was apparently his first day at work. (IPSCO App. at 82). At some point that same day, while in Sedona's offices, Mr. Subcliff was presented with IPSCO's Contract of Hire form, which he signed.[4] (<u>Id.</u> at 42-43). He was given an opportunity to read the document but does not recall if he did so. (<u>Id.</u> at 43; IPSCO Supp. App. at 196). What the document meant may have been explained to him, he does not recall. (IPSCO App. at 43).

The contract contained the prefatory statement: "IPSCO desires that I perform services at the [Camanche] Facility but only on condition that IPSCO and I execute and mutually agree to be bound by the terms and conditions of this Agreement." (IPSCO App. at 80). The contract was not signed by a representative of IPSCO. The contract continued that the parties agreed IPSCO was Mr. Subcliff's co-employer for the purposes of workers' compensation and occupational disease laws, Mr. Subcliff would be under the control and supervision of IPSCO and not Sedona, work issues would

---

[4] The Contract of Hire included in the summary judgment record shows a date of "14 day of March, 2000," with the "2000" year part of the form. (IPSCO App. at 81) The Court understands there is no dispute about the fact the Contract for Hire was signed in 2003.

be resolved by IPSCO, IPSCO would direct the manner and method of his work and have the right to assign tasks, IPSCO would provide all equipment for Mr. Subcliff's work, and IPSCO would set the safety rules and be responsible for professional and safety training. (<u>Id.</u>) Mr. Subcliff acknowledged that IPSCO had the right in its discretion to terminate his work for IPSCO, that his wages would be paid by Sedona, and any benefits were limited to those offered by Sedona. Mr. Subcliff further agreed that in the event of a work-related injury his sole remedy was through Iowa's workers' compensation laws. He released and covenanted not to sue IPSCO for damages due to a workplace injury. (<u>Id.</u> at 81).

Though not addressed in the Contract of Hire, Mr. Subcliff was told by either Sedona or IPSCO that after a probationary period he would be considered for permanent employment with IPSCO. (IPSCO App. at 34, 45, 49). He was uncertain about the length of the probationary period, but believed he had been told it was ninety days. (<u>Id.</u>)

At the orientation meeting at IPSCO, which lasted four to five hours, Mr. Subcliff was told what his job assignment would be (hydrotest operator), what department he was in (finishing department), who his team leader was and to what shift he was assigned. (IPSCO App. at 33-34, 37, 43-45; 84). Mr. Subcliff was assigned to a group of employees consisting of permanent IPSCO employees and temporary employees. (<u>Id.</u> at 45). All job and safety

10

training was conducted at IPSCO by IPSCO employees. (<u>Id.</u> at 44, 82). No Sedona personnel were present in the plant to manage, supervise or be responsible for the Sedona people working within the plant.(<u>Id.</u> at 46).

Mr. Subcliff was injured on April 4, 2003 when he was struck in the head by a pipe while he was working in the area of the finishing line. (IPSCO App. at 2). An addition to the plant finishing line was made in about 1997. Brandt provided and installed conveyors, conveyor motors, and skids for the transfer of pipe between process equipment. (<u>Id.</u> at 101, 109-10; Brandt App. at 23, 59). Subcliff's tort claims against Brandt are based primarily on the allegation that the finishing line as designed and built was over-sloped so that pipes could roll over "PacMan"[5] disks intended to interrupt and control the roll of pipes to the hydrotester. (Brandt App. at 48-49; IPSCO Supp. App. at 229, 237).

Brandt's design engineer John Grebinski has testified the foundation of the hydrotester area had been incorrectly drawn or installed by the structural subcontractor, Russell Construction, resulting in the skids installed by Brandt sloping differently than as planned. (Brandt App. at 33-34, 39, 44). Grebinski testified Brandt consulted with IPSCO's project manager, Phil Serblowski, about the elevation error and Serblowski responded "leave it as it

---

[5] So named because the notched disks resemble the familiar video game character. (IPSCO Supp. App. at 229).

is and we'll do a wait and see." (<u>Id.</u> at 34). Mr. Serblowski does not recall any problems with the hydrotester foundation and denies Brandt told him of any. (<u>Id.</u> at 45, 46). For the purposes of the present motion the Court takes Mr. Grebinski's testimony as true.

Mr. Subcliff received workers' compensation benefits for his injury from "Sedona['s] . . . workers' compensation insurance carrier." (May 2, 2005 Notice of Lien). IPSCO did not file a First Report of Injury with the Iowa Industrial Commissioner with respect to the injury. (Brandt App. at 18)[6] IPSCO was not named as a co-insured on Sedona's Certificate of Liability Insurance. (<u>Id.</u> at 50-51).

### III.

### DISCUSSION

A.   <u>Joint Employer Immunity from Contribution</u>

IPSCO argues that as a consequence of Iowa's workers' compensation laws it is immune from a claim of contribution from Brandt because Mr. Subcliff was its employee at the time of the injury. When an employer's workers' compensation liability is insured and benefits are recoverable, an action for workers' compensation benefits is the exclusive remedy available to an employee against an employer for work-related injury. Iowa Code § 85.20(1); <u>Meade v. Ries</u>, 642 N.W.2d 237, 242 (Iowa 2002). "Section

---

[6] IPSCO did not apply to the Iowa Insurance Commissioner to be a self-insured employer. (Brandt App. at 13-14).

85.20 provides a quid pro quo not for third parties, but for employers, who are required by law to carry workers' compensation insurance or become self-insured in order to be in a position to compensate their employees who are injured on the job." Smith v. CRST Intern., Inc., 553 N.W.2d 890, 895 (Iowa 1996). Common liability is the hallmark of contribution. State, Dep't of Human Services ex rel. Palmer v. Unisys Corp., 637 N.W.2d 142, 152-53 (Iowa 2001); City of Cedar Falls v. Cedar Falls Comm. Schl. Dist., 617 N.W.2d 11, 21 (Iowa 2000). The Iowa Supreme Court has held that by reason of the section 85.20 exclusivity provision a third-party plaintiff's contribution claim against an employer resulting from a work-related injury to an employee is barred for lack of common liability to the employee. Reese v. Werts Corp., 379 N.W.2d 1, 5 (Iowa 1986).

Brandt responds IPSCO is not entitled to summary judgment on the basis of the immunity afforded by the workers' compensation law because IPSCO did not itself insure its workers' compensation liability and there is a fact issue about IPSCO's alleged status as Mr. Subcliff's employer.

It is evident that through its contracts with Sedona and the temporary workers furnished by it, IPSCO attempted to structure a joint employer arrangement which would entitle it to protection from lawsuits resulting from workplace injuries to temporary workers. In principle, there is nothing wrong with this under Iowa

law. Particularly in the case of a general employer like Sedona which is in the business of furnishing employees to others, a "special employer" to whom the "brokered" employee is sent can also be an employer under Iowa's workers' compensation scheme. See Swanson v. White Consol. Indus., Inc., 30 F.3d 971, 974-75 (8th Cir. 1994); Parson v. Procter & Gamble Mfg. Co., 514 N.W.2d 891, 894-96 (Iowa 1994); Fletcher v. Apache Hose & Belting Co., Inc., 519 N.W.2d 839, 840-41 (Iowa App. 1994); Jones v. Sheller-Globe Corp., 487 N.W.2d 88, 93 (Iowa App. 1992);[7] 7 Larson's Workers' Compensation Law § 67.05[3]; see also Velazquez v. Hydro Conduit Corp., 715 N.W.2d 767, 2006 WL 469351, at *2 (Iowa App. 2006)(Table); Willms v. Assoc. Materials, Inc., 695 N.W.2d 43, 2004 WL 2578969 at *2-3 (Iowa App. 2004)(Table). Before getting to the employment issue it is appropriate to first address two threshold arguments made by Brandt: (1) even if Mr. Subcliff was a joint employee of  IPSCO and Sedona, IPSCO is not entitled to the protection of the workers' compensation law because it did not itself insure its liability under the statute; and (2) Mr. Subcliff's waiver of claims in the IPSCO Contract of Hire is unenforceable.

---

[7] In Parson the Iowa Supreme Court distinguished the result in Jones because in the latter case the Iowa Court of Appeals failed to recognize the employment issue was a question of fact. 514 N.W.2d at 897. The Supreme Court did not take issue with the Jones court's discussion of the applicable law pertaining to "brokered" employees provided by an employment service.

IPSCO contracted with Sedona to obtain workers' compensation insurance, Sedona obtained the insurance for the temporary employees it furnished IPSCO, and Mr. Subcliff has received the benefits of that insurance. An employer is required to insure its liability under the workers' compensation law. Iowa Code § 87.1. Nothing in the statute prohibits joint employers from allocating between themselves the responsibility for obtaining insurance for their mutual workers' compensation liability. In Jones the Iowa Court of Appeals approved of just such an arrangement. 487 N.W.2d at 90. As the Iowa cases illustrate, with brokered employees it is common for the employment service to provide the required workers' compensation insurance. See Swanson, 30 F.3d at 972; Parson, 514 N.W.2d at 892. Moreover, though IPSCO did not itself obtain the workers' compensation coverage, it bore the cost through the 38% wage overage charged by Sedona. It is not significant that Sedona failed to perform its contractual obligation to have IPSCO included as an additional insured on the policy issued by the workers' compensation carrier. As joint employers of Mr. Subcliff IPSCO and Sedona would be jointly liable for the benefits to which Mr. Subcliff was entitled under the workers' compensation laws. As a result of the workers' compensation insurance procured by Sedona Mr. Subcliff has received all of the benefits to which he would be entitled in a bona fide joint employment relationship.

15

If IPSCO is entitled to claim the immunity from suit afforded by § 85.20, Mr. Subcliff's purported waiver of his right to sue IPSCO for a work-related injury is surplusage, but not void as in violation of the statutory prohibition against contracts purporting to relieve an employer from its workers' compensation liability. Iowa Code § 85.18. The Court agrees the contractual waiver would be unenforceable if Sedona had breached the obligation under its contract with IPSCO to obtain the workers' compensation insurance coverage thus exposing both IPSCO and Sedona to an action at law by Mr. Subcliff for damages. Iowa Code § 87.21.

Turning to the employment issue, Iowa law starts with a presumption that a general employer, here Sedona, "continues to be the sole employer" of the worker. Parson, 514 N.W.2d at 894. In determining whether an alleged employer falls within the workers' compensation scheme the focus is on the agreement between an employer and worker. Id. at 893 (citing Rouse v. State, 369 N.W.2d 811, 814 (Iowa 1985), in turn quoting 1B Arthur Larson, The Law of Workmen's Compensation § 47.10 at 8-304 - 309 (1993)). The "paramount" consideration is whether the worker and alleged special employer intended to enter into a contract of employment. Id. at 897 (citing Rouse, 369 N.W.2d at 814). "Thus, the threshold determination in deciding whether a worker falls into the workers' compensation scheme is whether the worker entered into a contract of hire, express or implied, a fact issue." Id. at 893-94.

This question of fact . . . is resolved by examining evidence relevant to [the employee's] and [the purported employer's] intent to enter into such a contract . . . . Such evidence may consist of documentary evidence, as well as the testimony of [the general employer and special employer] employees. The evidence must show not only that [the purported employer] agreed to enter into a contract for service, but also that [the employee] had an informed and deliberate intent to do so.

Swanson, 30 F.3d at 973 (citing Parson, 514 N.W.2d at 893, 895, 897).

Unlike the "many cases" referenced by the Parson court, 514 N.W.2d at 894, in this case there is evidence of an express, written employment contract between IPSCO and Mr. Subcliff, the Contract of Hire. IPSCO points to this, together with its contract with Sedona, as clearly evincing mutual intent by IPSCO and Mr. Subcliff to enter into the requisite contractual relationship. Brandt responds that under the terms of the Contract of Hire it is not binding because IPSCO failed to sign it, in any event Mr. Subcliff did not read the contract, and it is clear from the Sedona Contract Services Agreement and Contract of Hire that IPSCO intended Mr. Subcliff to be an employee only for the purposes of obtaining workers' compensation immunity from litigation.

In the absence of a statutory requirement "or an agreement that the contract shall not be binding until it is signed signatures of both parties are not essential for establishment of a binding contract if manifestation of mutual expressions of

17

consent is otherwise shown." Service Employees Int'l, Loc. No. 55 v. Cedar Rapids Comm. Schl. Dist., 222 N.W.2d 403, 407 (Iowa 1974). In the Contract of Hire Mr. Subcliff acknowledged that "IPSCO desires that I perform services at the facility but only on condition that IPSCO and I execute and mutually agree to be bound by the terms and conditions of this agreement." (IPSCO App. at 80). This prefatory indication of IPSCO's condition for Mr. Subcliff's performance of services at the plant does not unambiguously reflect an agreement that the Contract of Hire was not binding in the absence of the signatures of both parties. Subsequent performance of the contract by both IPSCO and Mr. Subcliff is indicative of their mutual assent to it. Id. It is true Mr. Subcliff did not read the contract, but that does not affect its validity. Absent some justification, "[a] party who voluntarily executed a document without reading it is bound by its terms." 17 Am. Jur.2d Contracts § 210 at 215.

The Contract of Hire with Mr. Subcliff and Contract Service Agreement with Sedona were intended to structure a relationship in which IPSCO would be a joint, "special" employer of Subcliff entitled to workers' compensation immunity from suit, but did not limit the employment relationship only to that purpose. To the contrary, the contracts reserved to IPSCO the traditional employer prerequisites of control, supervision, direction, job assignment, training and termination of employment at IPSCO. (IPSCO

App. at 70-71, 80). In this regard the circumstances are much different than those before the Iowa Supreme Court in <u>Parson</u> which reversed summary judgment in favor of the alleged special employer, Proctor & Gamble. In <u>Parson</u> there was no express contract with the worker and the contract with the employment service provider indicated Proctor & Gamble intended not to enter into an employment contract with the service provider's workers. 514 N.W.2d at 894.[8]

The Court does agree with Brandt, however, to the extent that the express contracts outlining the tripartite relationship should not be determinative of the existence of an employment relationship between IPSCO and Mr. Subcliff. As the contracts were intended to give IPSCO the advantage of workers' compensation immunity from suit, it is appropriate to examine whether the reality of the arrangement reflects a contract for hire. This leads to an examination of the five-factor employment test set out by the Iowa Supreme Court in <u>Henderson v. Jennie Edmundson Hospital</u>, 178 N.W.2d 429, 431 (1970). <u>See</u> <u>Parson</u>, 514 N.W.2d at 895; <u>Caterpillar Tractor Co. v. Shook</u>, 313 N.W.2d 503, 505 (Iowa 1981).

<u>Henderson</u> holds:

> The factors by which to determine whether an employer-employee relationship exists are: (1) the right of selection, or to employ at will (2) responsibility for the payment of

---

[8] The <u>Parson</u> court noted "each case in the temporary employer context differs from the next with respect to the circumstances surrounding the contract/consent element and the application of the multifactored tests." 514 N.W.2d at 896 n.3

> wages by the employer (3) the right to
> discharge or terminate the relationship (4)
> the right to control the work, and (5) is the
> party sought to be held as the employer the
> responsible authority in charge of the work or
> for whose benefit the work is performed.

178 N.W.2d at 431.[9] In the Court's judgment the factors are fully

consistent with recognizing IPSCO's status as a special employer of

Mr. Subcliff. Through its interview process and right of rejection

IPSCO had the right to select and in fact selected the employees

who worked in its plant. Sedona paid wages to Mr. Subcliff and

billed the wages to IPSCO which reimbursed Sedona. Mr. Subcliff's

wages were based entirely on the hours he worked at IPSCO. He

reported for work and maintained time records in the same manner as

permanent IPSCO employees. (IPSCO App. at 70). IPSCO had the right

to terminate Mr. Subcliff's work at the plant. IPSCO had the sole

right to control Mr. Subcliff's work. IPSCO had both the

responsibility for his work and the work performed by Mr. Subcliff

was solely that of IPSCO and to its direct benefit. To be sure,

Sedona had involvement in some of these functions. No one disputes

that Mr. Subcliff was an employee of Sedona, the question is

whether IPSCO was also an employer. Where a legitimate joint

---

[9] These "major elements of the employer-employee relationship
for the purpose of our [workers'] compensation act" were originally
articulated by the Iowa Supreme Court in Usgaard v. Silver Crest
Golf Club, 256 Iowa 453, 456, 127 N.W.2d 636, 637, 638 (1964). The
test is "only an aid to the analysis . . . and of secondary
consideration to the contract requirement." Parson, 514 N.W.2d at
895 (citation omitted).

employment relationship is present it is to be expected that the employee's relationship with both employers would evince the attributes of employment encapsulated in the <u>Henderson</u> factors. Here, in every sense except tax, insurance and payroll functions, IPSCO was Mr. Subcliff's employer.

Regardless of whether the Contract of Hire between IPSCO and Mr. Subcliff was binding, having been executed by Mr. Subcliff it is strong evidence of his intent to enter into an employment relationship with IPSCO. Mr. Subcliff viewed himself as an IPSCO employee and in the workplace, except for his probationary status, was treated the same as permanent IPSCO employees. He went to work at IPSCO anticipating that if he performed satisfactorily he would eventually be offered permanent employment.

Where an asserted joint employment relationship is challenged it is usually the injured worker who does so in order to maintain a personal injury action against the alleged special employer in whose service he or she was injured. That was the situation in all of the Iowa cases cited <u>supra</u> at 14. Here, however, there appears to be no dispute between IPSCO and Mr. Subcliff about the existence of an employment relationship between them.

In the face of the written Contract Service Agreement and Contract of Hire with the latter's express acknowledgment of an employment relationship, the <u>Henderson</u> factors probative of an

employment relationship, the lack of any dispute between Mr.
Subcliff and IPSCO about their employment relationship, and
evidence that for all practical purposes Mr. Subcliff was treated
as a probationary employee of IPSCO, the Court does not believe a
reasonable fact finder could conclude otherwise than that IPSCO and
Mr. Subcliff intended to enter into a contract of employment. There
is no genuine issue of material fact about the fundamentals of the
tripartite relationship. Consequently, giving Brandt the favorable
view of the evidence to which it is entitled, as a matter of law
Mr. Subcliff was the joint employee of IPSCO and Sedona, with IPSCO
as the special employer as recognized by Iowa law, entitled to
immunity from suit under Iowa Code § 85.20. As IPSCO thus could
have no liability to Mr. Subcliff in common with Brandt, IPSCO's
motion for summary judgment will be granted on Brandt's
contribution claim.

B.   Indemnity

        Brandt advances two common law indemnity theories, one
based on an alleged independent duty resulting from a statement
made by IPSCO's project manager, Mr. Serblowski, and the other upon
Restatement (First) of Restitution section 90 (1937).

    1.   Independent Duty

        As noted previously, Brandt's design engineer, Mr.
Grebinski, has testified the hydrotester foundation was incorrectly
drawn or installed by the structural contractor. As a result,

according to Brandt, the skids installed by Brandt sloped differently than was planned, skewed to one side. For the purposes of the present motion the Court takes as true Brandt's assertion that the skewed slope was causally related to the injury to Mr. Subcliff by contributing to the over-steep slope which is part of Mr. Subcliff's theory of the case.

Before the skids were installed, IPSCO's project Manager, Mr. Serblowski, was informed of the problem with the foundation. According to Mr. Grebinski, the discussion with Mr. Serblowski went as follows:

> What we did was we conferred with the general who was in charge of the installation and -- it was Phil Serblowski, and asked him what should we do. It was a matter of either building up the foundation and cutting this side down, and his instruction was to leave it as it is and we'll do a wait and see.

(Brandt App. at 34). Brandt proceeded to install the skids. It argues that Mr. Serblowski's "wait and see" remark amounted to an agreement by IPSCO to monitor the performance of the hydrotester and inform Brandt of any problems caused by the slope, and that this agreement was the source of an independent duty to Brandt. IPSCO did not alert Brandt to any post-installation problems, had it done so the injury could have been prevented by Brandt, and IPSCO was therefore liable to indemnify Brandt.

Breach of an independent duty is one species of indemnity recognized in Iowa. Hansen v. Anderson, Wilmarth & Van Der Maaten,

630 N.W.2d 818, 823 (Iowa 2001). As the name implies, there must be proof "the indemnitor owed a duty to the indemnitee." Id. at 824. The existence of a duty is a legal question. Id. at 823. An indemnity claim against the employer of an injured worker based on breach of an independent duty is not barred by the workers' compensation law's exclusivity provision because the indemnity is not dependent on common liability, but rather, arises from the relationship between the employer indemnitor and the third-party indemnitee. Iowa Power & Light Co. v. Abild Const. Co., 144 N.W.2d 303, 308-09 (Iowa 1966).

The purchase of services or equipment does not itself impose a duty on an employer/purchaser to notify the manufacturer of defects. McNally & Nimergood v. Neumann-Kiewit Constructors, Inc., 648 N.W.2d 564, 573 (Iowa 2002); Johnson v. Interstate Power Co., 481 N.W.2d 310, 320 (Iowa 1992); Olch v. Pacific Press & Shear Co., 573 P.2d 1355, 1359 (Wash. App. 1978). "[A]n alleged breach of an independent duty must be shown to exist as a *specific and defined duty* before it will provide a basis for indemnity of a third party against an employer providing workers' compensation benefits." Johnson, 481 N.W.2d at 319 (quoting Olch, 573 P.2d at 1358, in turn citing Hysell v. Iowa Public Service Co., 534 F.2d 775, 782 (8th Cir. 1976)(emphasis added). The Johnson court gave a contractual "agreement [by the employer/indemnitor] to perform necessary repairs, and to install subsidiary safety devices" for

24

a machine's safe operation as an example of the kind of obligation which could give rise to an independent duty sufficient to support an indemnity claim. <u>Johnson</u>, 481 N.W.2d at 319.

It is evident Brandt has constructed its independent duty argument to conform to the result in <u>Abild</u>, <u>supra</u>. That case involved an injury to Abild's employee during the construction of a grain bin. The injury occurred when an angle iron the employee was holding came into contact with the power company's high voltage power line. The power company (Ipalco) sought contribution and indemnity from Abild on a number of grounds including an independent duty arising from an informal agreement between Abild and the power company under which "Abild agreed through its foreman to notify Ipalco [a day or two ahead of time] when the work came near the power lines so that Ipalco could take the necessary safety precautions to protect workmen." 144 N.W.2d at 315, 316. The Iowa Supreme Court found sufficient evidence to support a jury finding that Abild and Ipalco had entered into a contract which imposed a duty on Abild to give the notification promised, the breach of which entitled Ipalco to indemnity. <u>Id.</u> at 316-17.

Mr. Serblowski's alleged instruction to Mr. Grebinski to leave things as they were and "we'll do a wait and see" was far short of the express, specific contractual promise made by Abild to notify the power company before Abild did work near the power lines, notification which, it should be noted, was a precaution

25

intended to avoid precisely the kind of injury which occurred. Serblowski's statement cannot reasonably be construed as undertaking an obligation to Brandt either to monitor the performance of the hydrotester or inform Brandt of any problems with the skewed slope as Brandt alleges. It is entirely too vague and ambiguous to have given rise to a contractual or other duty to Brandt to do any thing, much less a specific and defined duty. Mr. Serblowski did not agree to perform any specific act. It follows that the evidence is insufficient to establish that IPSCO owed an independent duty to Brandt arising from Mr. Serblowski's "wait and see" remark.[10]

    2.    The Restatement

    Section 90 states:

> A person who, at the direction of and on account of another, has done an authorized act because of which both are liable in tort, is

---

[10] IPSCO points out that its "Purchase Order Contract" with Brandt, which was purportedly the sole and entire agreement between them, contained an indemnity provision in its favor. Brandt responds there is insufficient proof in the summary judgment that it agreed the document was a part of its contract with IPSCO and were it to be given contractual effect, the Purchase Order Contract required IPSCO to notify Brandt of defective work or materials. (IPSCO App. at 117, 121, 131 (respectively §§ 1.08, 5.12(2), 9.05)).

    The Purchase Order Contract is not significant to resolution of the indemnity claim. The Court is not convinced the contract would preclude an independent duty arising from promises made in connection with difficulties encountered in the performance of the contract, the indemnity provision to which IPSCO refers pertains to failures to comply with codes, laws, regulations, permits and the like, and the provision Brandt highlights is merely a warranty clause.

> entitled to indemnity from the other for
> expenditures properly made in the discharge of
> such liability, if he acted in reliance upon
> the lawfulness of the direction, and, as
> between the two, his reliance was justifiable.

The rule "has its most frequent application where a person directs a servant or other agent to act on his account in the seizure of goods or the entry upon land," but applies also "where a person directs an independent contractor to act on his account" or "where a judgment creditor directs a sheriff to take specific goods upon execution." Section 90 cmt. a.

The Iowa courts have recognized section 90 as a form of common law indemnity, but they have never applied it or discussed it much. In <u>Epley v. S. Patti Const. Co.</u>, 228 F. Supp. 1, 5 (N.D. Iowa 1964), <u>rev'd</u>, 342 F.2d 830 (8th Cir. 1965), Judge Hanson of this Court included section 90 in describing the four different situations in which a party is entitled to common law indemnity:

> (1) . . . .
> (2) Where the one seeking indemnity has
> incurred liability by action at the direction,
> in the interest of, and in reliance upon the
> one sought to be charged. Restatement
> Restitution Sec. 90.
> (3) . . . .
> (4) . . . .

In the past forty years the quoted language has been passed down unaltered and without elaboration. <u>Hawkins Const. Co. v. First Federal Savings & Loan Assoc.</u>, 416 F. Supp. 388, 392 (S.D. Iowa 1976); <u>Hansen</u>, 630 N.W.2d at 823; <u>C. F. Sales, Inc. v. Amfert, Inc.</u>, 344 N.W.2d 543, 553-54 (Iowa 1983); <u>Peters v. Lyons</u>, 168

N.W.2d 759, 767 (Iowa 1969). Most recently our sister court in the Northern District rejected section 90 as a basis for indemnity in favor of a third party against an injured worker's employer. The court held "the *only* basis for an indemnity claim by a third party against an injured party's employer that is recognized by Iowa law is the 'independent duty' basis." <u>Cochran v. Gehrke Const.</u>, 235 F. Supp. 2d 991, 1005 (N.D. Iowa 2002)(emphasis original).

This Court agrees with the <u>Cochran</u> court that section 90 will not support a third party's indemnity claim against an injured worker's employer in light of the exclusive remedy provision in the workers' compensation law, but for a more particular reason. As with a contribution claim, indemnity liability under section 90 is dependent on common liability to the injured worker. Section 90 essentially provides for indemnity in favor of a servant or agent who acts at the direction of and for his master or principal. It is a kind of primary versus secondary fault distinction which apparently remains alive after the Iowa Supreme Court's abandonment of active/passive negligence indemnity in <u>American Trust & Savings Bank</u>, 439 N.W.2d at 190. <u>See</u> note 2 <u>supra</u>. Like active/passive negligence indemnity, indemnity under section 90 operates as "an extreme form of contribution." <u>Abild</u>, 144 N.W.2d at 309 (quoting <u>Slattery v. Marra Bros.</u>, 186 F.2d 134, 138 (2d Cir.), <u>cert. denied</u>, 341 U.S. 915 (1951)). It follows that as with active/passive negligence "[t]his form of indemnity is barred by the common

liability rule when one of the tortfeasors is an employer under the Workmen's Compensation Act." <u>Abild</u>, 144 N.W.2d at 309. Beyond analogy to active/passive negligence indemnity, by its terms section 90 requires common liability. It applies when indemnitor and indemnitee "both are liable in tort." IPSCO is not liable in tort to Mr. Subcliff.

For the reasons indicated, this Court does not believe the Iowa Supreme Court would recognize a cause of action for indemnity under section 90 in favor of a third-party against the employer of an injured worker where the employer is entitled to the benefit of the exclusive remedy provision in Iowa Code § 85.20.

## IV.

### CONCLUSION

For the reasons discussed, the Court concludes that there is no genuine issue as to any material fact and that IPSCO is entitled to judgment as a matter of law on Brandt's Third-Party Complaint. IPSCO's motion for summary judgment [51] is **granted.** Brandt's third-party complaint is dismissed and IPSCO is terminated as a party in this case.

IT IS SO ORDERED.

Dated this 3d day of October, 2006.

ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE